**NOT YET SCHEDULED FOR ORAL ARGUMENT**

**Nos. 13-7198, 14-7029**

# In the United States Court of Appeals for the District of Columbia Circuit

_____

HOWARD TOWN CENTER DEVELOPER, LLC;
CASTLEROCK PARTNERS, LLC,
APPELLANTS

*v.*

HOWARD UNIVERSITY,
APPELLEE

_____

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA (CIV. NO. 13-1075)
(THE HONORABLE BERYL A. HOWELL, J.)*

_____

**BRIEF OF APPELLANTS HOWARD TOWN CENTER DEVELOPER, LLC;
CASTLEROCK PARTNERS, LLC**

_____

JOHN E. SCHMIDTLEIN
KENNETH C. SMURZYNSKI
MASHA G. HANSFORD
WILLIAMS & CONNOLLY LLP
*725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000*

## CERTIFICATE OF PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel for Appellants Howard Town Center Developer, LLC, and CastleRock Partners, LLC, make the following certification:

**(A)   Parties and Amici.**

**Appellants:** Howard Town Center Developer, LLC, and CastleRock Partners, LLC, have no parent corporations. No publicly held company owns 10% or more of either appellant's stock.

**Appellee:** Howard University is not an affiliate or parent of any corporation, and no company has any ownership interest in Howard University.

**Intervenors/Amici:** None.

**(B)   Rulings Under Review.** The rulings at issue in this appeal are:

(1)   The December 19, 2013, Memorandum Opinion and Order granting summary judgment to appellee and denying appellants' motion to amend the complaint issued by Judge Beryl A. Howell of the United States District Court for the District of Columbia in Civ. No. 13-1075. That ruling is not yet reported, but it is available at 2013 WL 6671748. The ruling is in the appendix at J.A. 462.

(2)   The February 11, 2014, order on motion for attorney fees issued by Judge Beryl A. Howell of the United States District Court for the District of Columbia in Civ. No. 13-1075. That ruling is not reported. It is in the ap-

pendix at J.A. 9.

**(C)  Related Cases.** This case has not been previously before this Court or any other court for appellate review. Appellants are unaware of any related case involving substantially the same parties and the same or similar issues.

/s/ John E. Schmidtlein
JOHN E. SCHMIDTLEIN

# TABLE OF CONTENTS

Page

Statement Of Jurisdiction ................................................................1

Statement Of The Issues ..................................................................2

Statutes And Regulations ................................................................2

Statement Of The Case ....................................................................2

    A.    Background ................................................................2

    B.    The Governing Documents ......................................3

    C.    The Initial Development Of The Project ..................7

    D.    The April 6, 2012, Term Sheet ................................8

    E.    Discussions Surrounding The Second Amendments ......................9

    F.    Landlord Seeks To Terminate Lease ......................11

    G.    Tenant Files Suit ....................................................13

Summary Of Argument ..................................................................14

Argument ........................................................................................17

    I.    Standard Of Review ................................................17

    II.    The District Court Erred In Holding That There Is No Dispute Of Material Fact As To Whether Tenant Violated Its Payment Obligation Under The Lease ..........................18

        A.    The Rent Payment Was Not Due On May 30, 2013 ..........18

        B.    To The Extent A Rent Payment Was Due On May 30, 2013, It Was Payable Into An Escrow Account Landlord Refused To Establish, Making Performance Impossible ..25

    III.    Landlord Failed To Comply With The Notice Provision Applicable To A Termination Of The Ground Lease, And Tenant Made Payment Prior To The Expiration Of Any Cure Period ....................................................................31

    IV.    Even Assuming That Tenant Breached, The District Court Erred In Granting Summary Judgment As To Forfeiture ........34

Conclusion...........................................................................................................50

# TABLE OF AUTHORITIES

## CASES

*Aera Energy LLC v. Salazar*, 642 F.3d 212 (D.C. Cir. 2011) ...........................25

*Ass'n of Am. R.R.s v. Connerton*, 723 A.2d 858, 862 (D.C. 1999) ....................36

*Burrows Motor Co. v. Davis*, 76 A.2d 163 (D.C. 1950) ......................................36

*City of Las Vegas v. Lujan*, 891 F.2d 927 (D.C. Cir. 1989) ...............................17

*Cohen v. Food Town, Inc.*, 207 A.2d 122 (D.C. 1965) ........................................49

*Dano Res. Recovery, Inc. v. District of Columbia*, 620 A.2d 1346
  (D.C. 1993) ........................................................................................................47

*Drazin v. Am. Oil Co.*, 395 A.2d 32 (D.C. 1978) .................................................46

*Duffy v. Duffy*, 881 A.2d 630 (D.C. 2005) ...........................................................20

*Dyer v. Bilaal*, 983 A.2d 349 (D.C. 2009) ...........................................................21

*E. Capitol View Cmty. Dev. Corp. v. Robinson*, 941 A.2d 1036
  (D.C. 2008) ........................................................................................................29

*EastBanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A.2d
  996 (D.C. 2008) ......................................................................................19, 20, 21

*Entrepreneur, Ltd. v. Yasuna*, 498 A.2d
  1151 (D.C. 1985) ........................................35, 36, 37, 40, 43, 44, 45, 46

*Gaujacq v. EDF, Inc.*, 601 F.3d 565 (D.C. Cir. 2010) .......................................17

*Gunn v. Brown*, 59 A.2d 518 (D.C. 1948) ...........................................................49

*Hais v. Smith*, 547 A.2d 986 (D.C. 1988) (per curiam) ................................30, 42

*Hampton v. Vilsack*, 685 F.3d 1096 (D.C. Cir. 2012) .........................................17

*Hershon v. Hellman Co.*, 565 A.2d 282 (D.C. 1989) (per curiam) ....................19

Authorities upon which we chiefly rely are marked with asterisks.

v

*Horlick v. Wright*, 104 A.2d 825 (D.C. 1954) ......................................30

*In re Estate of Drake*, 4 A.3d 450 (D.C. 2010) ..................................30

*Independence Mgmt. Co. v. Anderson & Summers, LLC*, 874
  A.2d 862 (D.C. 2005) ......................................................47

*Kellmer v. Raines*, 674 F.3d 848 (D.C. Cir. 2012) .............................35

*Nyhus v. Travel Mgmt. Corp.*, 466 F.2d 440 (D.C. Cir. 1972) ..........19

*Pritch v. Henry*, 543 A.2d 808 (D.C. 1988)..................................48

*Pro Football, Inc. v. Harjo*, 565 F.3d 880 (D.C. Cir. 2009) ........17, 35

*R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69 (2d Cir. 1984)................22

*\*Shapiro v. Tauber*, 575 A.2d 297 (D.C. 1990)..........35, 36, 37, 42, 44, 46, 47, 48

*Solomon v. Vilsack*, 628 F.3d 555 (D.C. Cir. 2010) ...........................17

*Stanford Hotels Corp. v. Potomac Creek Assocs., L.P.*, 18 A.3d
  725 (D.C. 2011) ............................................................21

*Steele v. Schafer*, 535 F.3d 689 (D.C. Cir. 2008) .................................17

*\*Trans-Lux Radio City Corp. v. Serv. Parking Corp.*, 54 A.2d
  144 (D.C. 1947) ........................................................36, 37, 48

*United States v. Berry*, 618 F.3d 13 (D.C. Cir. 2010) ........................17

## STATUTES AND RULES

28 U.S.C. § 1291 ..............................................................1

28 U.S.C. § 1332(a)(1) ........................................................1

Fed. R. Civ. P. 56(a)..........................................................17

## MISCELLANEOUS

1 Arthur Linton Corbin, Corbin on Contracts § 2.9, at 155 (rev.
  ed. 1993) ....................................................................22

vi

Planning, *DUKE: Draft Development Framework for a Cultural Destination District Within Washington, DC's Greater Shaw / U Street* (Sept. 2004), *available at* http://tinyurl.com/mg76ynn .......................................................................5, 41

Restatement (Second) of Contracts § 205 cmt. d (1981) ...................................30

## STATEMENT OF JURISDICTION

This appeal arises from the district court's grant of summary judgment to defendant-appellee. The district court had jurisdiction under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and there is complete diversity between plaintiff and defendant and counter-plaintiff and both counter-defendants. Plaintiff in the underlying suit, Howard Town Center Developer, LLC, is a limited liability company whose members reside in Maryland and Virginia. Defendant Howard University is a citizen of the District of Columbia. For the counterclaim, the plaintiff is Howard University (a D.C. Citizen), and defendants are Howard Town Center Developer, LLC (a citizen of Maryland and Virginia) and CastleRock Partners, LLC, whose member resides in Virginia, and which is hence a citizen of that state.

The jurisdiction of this Court rests on 28 U.S.C. § 1291. The district court issued its Memorandum Opinion and Order granting appellee's motion for summary judgment and denying appellants' motion to amend the complaint on December 19, 2013. Appellants filed a notice of appeal on December 20, 2013. This Court subsequently ruled that the district court's December 19 decision is "final for purposes of 12 U.S.C. § 1291." *See* Order, No. 13-7198 (D.C. Cir. Mar. 25, 2014). On February 11, 2014, the district court granted appellee's motion for attorney fees and expenses. Appellants filed a notice of

appeal from that order on March 10, 2014. The appeal is from a final order that disposes of all parties' claims.

## STATEMENT OF THE ISSUES

1.     Did the district court err in ruling that no genuine dispute of material fact exists as to whether appellants had an obligation to make a rental payment to appellee on May 30, 2013?

2.     Did the district court err in ruling that no genuine dispute of material fact exists as to whether appellee provided the requisite notice for termination, and that appellants, to the extent a duty to pay rent existed, failed to timely cure?

3.     Did the district court err as a matter of law in holding that forfeiture of the Lease was warranted based on a purported six-day delay in payment?

## STATUTES AND REGULATIONS

There are no pertinent statutes or regulations in this case.

## STATEMENT OF THE CASE

### A.     Background

This case involves the development of Howard Town Center (the "Project"), a mixed use property that appellant Howard Town Center Developer, LLC ("Tenant") strived to construct on land it leased for a 99-year term from appellee Howard University ("Landlord"). The parties envisioned a vibrant

and economically beneficial project in the heart of the District. The relationship eventually soured, however. In 2013, Landlord purported to terminate the 99-year lease, and Tenant brought this suit. When Landlord filed a counterclaim, it named as defendants both Tenant and CastleRock Partners, LLC ("CastleRock")—the original lessee who assigned its rights to Tenant, *see* Joint Appendix ("J.A.") 353-54 (¶ 6 & n.2). CastleRock and Tenant are now appellants in this case.[1]

## B.    The Governing Documents

On January 22, 2010, Tenant and Landlord executed multiple, related agreements to set out their respective rights and obligations with respect to the Project. Three are relevant to this appeal.[2]

First, the parties executed a Ground Lease ("Ground Lease" or "Lease"). The document provided for a 99-year lease of certain land owned by Landlord. *See* J.A. 60 (§ 1.1). Among other terms, the Ground Lease required Tenant to make the following payments to Landlord: (a) $525,000 immediately; and (b) $1,475,000 by the "Closing Date," defined as the earlier of

---

[1] Because, as to the issues on appeal, CastleRock's responsibilities as an assignor are identical to Tenant's, this brief will refer to the latter in describing those rights and obligations.

[2] Prior to this date, Landlord and CastleRock entered into an initial development agreement with respect to the property, *see* J.A. 11, which CastleRock subsequently assigned to Tenant. *See id.* at 354 (¶ 6 n.2). That agreement is not at issue here.

the date on which the Tenant settled on a construction loan or March 15, 2011. *See id.* at 60 (§ 2.1(b)); *id.* at 57 (¶ e). The Ground Lease provided for subsequent monthly rent installments that would begin on a future date tied to certain development milestones not at issue here. *Id.* at 61 (§ 2.1(c)). The Lease also granted Tenant a right of first offer to purchase the parcel. *Id.* at 123 (§ 29.1).

The Ground Lease provided that certain events, including if Tenant was "in default with respect to any rental payments . . . , and should such default continue for a period of ten (10) days after written notice from Landlord," would constitute an "Event of Default." *See id.* at 104-05 (§ 16.2). It stated that upon an Event of Default, Landlord can elect to terminate the Lease and take possession of the premises. *Id.* at 105 (§ 16.2(a)). Before doing so, however, Landlord was obligated to provide notice of its intent to terminate the Lease and a ten-day cure period from the date of this second notice. *See id.* (§ 16.2(c)).[3]

Second, Tenant and Landlord executed a Development Agreement (also referred to as "Agreement") establishing a broad outline of construction requirements and deadlines. The Development Agreement recognized that the timeline may slip for "Unavoidable Delay." *See id.* at 166 (§ 1.1(ggg)); *id.*

---

[3] On the same date, the parties executed an amendment to the Ground Lease, but none of those modifications are relevant to this appeal.

at 178-79 (§ 3.10(c), (e)). The Development Agreement also provided that the construction "shall be consistent with the DUKE Plan," *id.* at 170 (§ 3.1(a)), a specific development framework approved by a District of Columbia Council Resolution. *See id.* at 162 (§ 1.1(z)); *see also* D.C. Office of Planning, *DUKE: Draft Development Framework for a Cultural Destination District Within Washington, DC's Greater Shaw / U Street* (Sept. 2004), *available at* http://tinyurl.com/mg76ynn. Like the Ground Lease, the Development Agreement defined various Events of Default, including failure to pay "any amount payable" under the Development Agreement "within twenty (20) days after receipt of written notice of such failure." *See id.* at 186 (§ 5.1(g)). If such an event occurred, the Agreement required Landlord to provide "a second written notice" of intent to terminate and specified that the Agreement would terminate if Tenant did not cure within twenty days of this second notice. *See id.* at 186 (§ 5.2(b)). A different provision allowed either party to "terminate [the Development] Agreement by written notice to the other" if the Ground Lease has been terminated. *Id.* at 188 (§ 5.4).

Third, Tenant and Landlord executed an Amendment to the Development Agreement. The parties had discovered that the soil and groundwater on the parcel were contaminated, and that the contamination would need to be remediated during excavation. *See id.* at 262, 265. The Amendment addressed this problem by providing that Landlord would pay for all the reme-

diation costs in excess of $750,000. *See id.* at 265-66 (¶ 6(c)). In order to en-sure the Landlord would meet its obligations regarding site remediation, the parties agreed to place Tenant's rent payments into an escrow account. *See id.* The Amendment provided that, "[u]pon the execution of this Amend-ment," the parties "shall establish an escrow account . . . with an escrow agent ('Escrow Agent') reasonably acceptable" to both. *Id.* at 265 (¶ 6(c)(i)). Thus, Tenant's obligation to pay $525,000 and $1,475,000 to Landlord as rent was replaced with an obligation to make these payments, when due under the Ground Lease, "to Escrow Agent." *Id.* Rather than being immediately avail-able to Landlord, the funds in the escrow account would be disbursed to an environmental remediation contractor, or returned to Tenant for reim-bursement of remediation costs it paid directly. *See id.* at 266 (¶ 6(c)(ii)). If funds remained after remediation was completed in its entirety and all reme-diation costs were paid, they would be released to Landlord at that time. *See id.* at 266 (¶ 6(c)(iii), (c)(iv)). But if remediation costs exceeded a certain fig-ure—as an environmental contractor subsequently determined they would for this parcel, *see id.* at 446 (¶ 4)—the $525,000 and $1,475,000 payments would be used entirely toward remediation. *See id.* at 266 (¶ 6(c)(iv)).

On January 25, 2010, Landlord, Tenant, and Regional Title Incorpo-rated executed an Escrow Agreement as required by the Amendment to the Development Agreement. The Escrow Agreement explained that, pursuant

6

to the parties' agreement "in the Amendment," Tenant was to pay $525,000 to Regional Title Incorporated "in lieu of" the payment to Landlord, and that Tenant was required to deposit the next payment of $1,475,000 into the same account "in lieu of the payment of the sum payable by Tenant to Landlord under Section 2.1(b) of the Lease." *See id.* at 269 (¶¶ C-D). Tenant then paid the first installment of rent, $525,000, to the Escrow Agent. *See id.* at 410 (¶ 19).

### C.    The Initial Development of the Project

In the ensuing months, Tenant took significant steps toward commencing construction and invested substantial resources in the Project, including but not limited to completing environmental exploration, obtaining permits, and submitting architectural drawings in compliance with the DUKE Plan. *See* J.A. 357 (¶¶ 20-21); *id.* at 439-40 (¶ 15); *id.* at 342. Tenant expended over $2,000,000 on these efforts. *Id.* at 357 (¶ 20). As challenges arose, the parties negotiated to resolve them, modifying construction deadlines and the deadline for the second installment of rent. *See id.* at 357 (¶ 22); *id.* at 291 (¶ g); *id.* at 441-42 (¶¶ 19-20). These negotiations continued well after the original deadline for the $1,475,000 payment, March 15, 2011. *See id.* at 286-91; *id.* at 441-42 (¶¶ 19-20).

In the course of the negotiations, Landlord requested an affirmation of Tenant's intent to pay the $1,475,000 by a later payment deadline, December

8, 2011. *See id.* at 291 (¶ g). A month later, in September 2011, Landlord sent Tenant a notice of default citing "anticipatory breach" of the project documents based on Tenant's purported failure to provide a written affirmation about the rent payment "due on December 8, 2011," as well as a number of development-related issues. *See id.* at 295. Tenant similarly raised issue about Landlord's actions that delayed development. *See id.* at 287. In February 2012, and again a month later, Landlord sent Tenant two notices of default and of intent to terminate. *See id.* at 297; *id.* at 301. The parties continued to discuss and negotiate in the weeks after Landlord sent these notices. *See id.* at 358 (¶¶ 23-26). In particular, Landlord was in immediate need of money, and sought to terminate the escrow requirement to permit disbursement of the $525,000 rent payment directly to the University. *See id.* at 438 (¶ 13).

### D.    The April 6, 2012, Term Sheet

On April 6, 2012, the parties executed a written agreement entitled "Term Sheet." The Term Sheet provided that the "Notice of Default and the Notice of Intent to Terminate," dated February 2012, and March 2012, respectively, "are hereby withdrawn." *See* J.A. 304. It further provided that the parties would amend the Escrow Agreement "such that $525,000 held in escrow for the purposes of environmental remediation will be released." *Id.* at 305 (¶ 3). The parties also committed to execute Second Amendments to the

8

Development Agreement and Ground Lease. Setting a new timetable for the $1,475,000 rent payment, the Term Sheet provided that "(a) no later than ten (10) days after execution of this Term Sheet, a payment of $100,000 will be made, and (b) the balance of $1,375,000 will be paid no later than ninety (90) days after the execution of the Ground Lease and Development Agreement Amendments ['Second Amendments']." *Id.* at 305 (¶ 4). The Term Sheet also laid out the parties' commitment to taking other steps such as negotiating over a proposed new rent schedule, and the Tenant pledging funds towards an apprenticeship program at Howard University. *See id.* at 305.

In accordance with the provisions of the Term Sheet, on May 10, 2012, the parties executed a Termination of Escrow Agreement, releasing the balance of the $525,000 that had been deposited into the escrow account to Landlord and terminating the relationship with Regional Title Incorporated as Escrow Agent. *See id.* at 307-08.

### E.     Discussions Surrounding the Second Amendments

Although the Term Sheet committed the parties to executing the Second Amendments promptly, Landlord delayed for months in returning the drafts to Tenant. *See* J.A. 438 (¶ 14). After this delay, the parties continued to negotiate over the Second Amendments and agreed on nearly all terms. *See id.* at 358 (¶¶ 26-27); *see also id.* at 314-37 (redline of Second Amendment draft reflecting only handful of remaining disagreements). As Tenant ex-

9

tolled Landlord to execute the Second Amendments many months after the Term Sheet was signed, the parties negotiated via email and phone conversation. *See, e.g.*, *id.* at 442-43 (¶¶ 22, 24). Although not required under any agreement, in the course of those negotiations Tenant provided evidence of financing for the Project as demanded by Landlord. *See id.* at 358 (¶¶ 24-25).

The Second Amendments—which remain unexecuted—contained language modifying Tenant's rental obligation, which, under the Amendment to the Development Agreement, was to be paid to the escrow agent. The Second Amendments stated that Tenant would make the $1,475,000 payment directly to Landlord rather than to an escrow agent and set the deadline for the rent payment as May 30, 2013. *See id.* at 316 (¶ 4). At the same time, the Second Amendments provided Tenant with important protections: they required Landlord to pay for remediation costs incurred within thirty days of receiving the invoice, and, insofar as Landlord failed to meet its obligations with respect to payment for site remediation, the Second Amendments provided that the unpaid amounts would bear interest at the actual cost to Tenant (not to exceed 18% per year), and could be offset against Tenant's rent payments. *See id.* at 315 (¶ 3). Critically, the Second Amendments modified the construction schedule, extending Tenant's deadlines for submitting designs and securing permits, and setting a construction commencement date of January 1, 2015, as well as a completion date of December 31, 2017. *See id.*

at 316-17 (¶¶ 5-6, 8).

In February 2013, to the surprise of the parties, the District of Columbia Preservation League filed applications to designate two abandoned buildings on the parcel as historic landmarks, such that they could not be demolished to make way for the new development as designed. *See id.* at 358-59 (¶¶ 28, 30). Tenant expressed concern about the potential for such a designation and notified Landlord that the application constituted Unavoidable Delay under the Development Agreement. *See id.* at 358 (¶ 29); *id.* at 338-39. On May 6, 2013, the District of Columbia Historic Preservation Board granted the application. *See id.* at 358-59 (¶ 30). Tenant sought Landlord's assurances that it would cooperate in resolving this new difficulty. *See id.* at 342-43.

Although Landlord in correspondence treated the date set out in the Second Amendments—May 30, 2013—as the deadline for the $1,475,000 payment, it refused to execute the Second Amendments. *See id.* at 358 (¶ 27); *id.* at 341. May 2013 ended in this state of upheaval, and Tenant did not make a $1,475,000 payment.

### F.     Landlord Seeks To Terminate Lease

Despite its continuing refusal to sign the Second Amendments, Landlord sent a single notice labeled "Notice of Default" and "Notice of Intent to Terminate" on June 3, 2013. *See* J.A. 344. In this notice, Landlord referred to May 30, 2013, as the deadline, and demanded that the payment be made "TO

THE UNIVERSITY." *Id.*

Because the Second Amendments were not executed at the time of the default notice, Tenant believed that—to the extent a payment was due—the Amendment to the Development Agreement provided the operative term about the payee, requiring the $1,475,000 payment to be made to an escrow agent. *See id.* at 360 (¶ 35 & n.6). To complicate the situation further, the escrow account contemplated by the Amendment to the Development Agreement, which had been created in the Amendment's immediate aftermath, had been disbanded by the parties. *See id.* at 307. Faced with a purported notice of default and obligation to make a payment to a nonexistent entity, Tenant reached out to Landlord in still further attempts to get it to execute the Second Amendments, which would redress the payee identity issue as well as offering Tenant the bargained-for assurances in exchange for losing the escrow protection. *See id.* at 360 (¶ 36). Landlord refused these repeated requests. *See id.* at 360 (¶ 37).

Because Tenant believed that the Amendment to the Development Agreement addressed the rent payment obligation, and because the Development Agreement provided for a twenty-day cure period, Tenant believed it had twenty days after the June 3, 2013, notice to cure any default. As it continued to reach out to Landlord to resolve the situation, Tenant received a notice dated June 14 stating that Landlord had terminated the Ground

Lease. *See id.* at 346. The June 14 notice announced the termination as a *fait accompli* and provided Tenant no further period of time to cure. *See id.* Three days later, Landlord sent a notice stating that the Development Agreement was terminated based on the termination of the Ground Lease. *See id.* at 348.

Believing it was still within the cure period and seeking to resolve the situation but unable to obtain Landlord's cooperation, *see id.* at 360 (¶ 36), Tenant created an escrow account and caused $1,475,000 to be deposited into that account on June 19, 2013. *See id.* at 350. Landlord refused to withdraw its termination notice or reengage in negotiations, instead making a point of telling Tenant that other developers had expressed interest in the project. *See id.* at 361 (¶ 40).

### G. Tenant Files Suit

On July 15, 2013, Tenant filed this suit to assert its property rights under the Lease. The district court denied Tenant's motion for a temporary restraining order. Landlord then filed a counterclaim for $1,475,000 and moved for summary judgment. The district court consolidated Tenant's motion for a preliminary injunction with summary judgment briefing. Granting summary judgment on Landlord's counterclaim, the district court ordered Tenant to pay Landlord $1,475,000. J.A. 500-01. Despite ordering payment of the rent, the district court also held that forfeiture of the Lease was appropriate,

granting summary judgment to Landlord as to the termination of the Ground Lease and Development Agreement. *Id.* at 491. Left with nothing, Tenant appealed.[4]

## SUMMARY OF ARGUMENT

This suit arises from Landlord's improper attempt to terminate a valuable 99-year ground lease based on a payment Tenant was not obliged to make, yet nonetheless promptly made in good faith.

1. The rent payment was not due on May 30, 2013, because Landlord refused to execute the Second Amendments. In the Term Sheet, a signed writing that amended the Ground Lease, the parties set a deadline for the bulk of the $1,475,000 payment as ninety days after the execution of Second Amendments to the Lease and Development Agreement. The Second Amendments have yet to be executed, so this deadline has yet to arrive. The Second Amendments themselves would have modified the payment date to May 30, 2013. But Landlord refused to sign the Second Amendments, and so this modification never became effective.

Even if the rent payment was due on May 30, it was due to an escrow agent who was to be selected by the parties, rather than directly to Landlord. The Amendment to the Development Agreement required the parties to set

---

[4] The district court also awarded Landlord $98,312.45 in attorney fees. Tenant did not and does not dispute the reasonableness of the amount of these fees. Tenant challenges the grant of fees on the basis that the district court's underlying judgment should be reversed.

up an escrow account and appoint an escrow agent. The Amendment also directed that when the $1,475,000 became due, Tenant was to pay it to the appointed escrow agent. The parties, however, had terminated their escrow account, and Landlord refused to set up another. Payment as required by the governing documents was therefore made impossible by Landlord. Landlord refused either to set up a new escrow account or execute the Second Amendments, which (while providing Tenant other protections) would have revoked the escrow requirement and allowed payment directly to Landlord. Tenant's nonpayment in these circumstances does not constitute a breach of the Lease.

2. While attempting to resolve these issues, Tenant received a notice of default and purported intent to terminate from Landlord on June 3, 2013, and then a notice that termination had occurred on June 14. The purported termination was improper. To the extent a payment was due on May 30, 2013, the failure to pay within ten days of the June 3 Notice (i.e., before June 14) constituted an "Event of Default." An Event of Default, alone, does not allow termination unless and until further notice, and a ten-day cure period, is provided. That notice was never provided. That cure period never commenced, let alone ran. Moreover, though unable to secure Landlord's cooperation, Tenant unilaterally set up an escrow account and caused the $1,475,000 to be deposited on June 19, 2013. The ten-day cure period, which could only have begun on June 14, could not have run by June 19, 2013, the date on which payment was made, so this cure was both reasonable and timely.

15

3. Even assuming that Tenant's June 19, 2013, payment breached the Lease, the district court erred in granting summary judgment as to whether forfeiture of the Lease was warranted. District of Columbia law sharply disfavors forfeiture as a remedy. Thus, forfeiture may not be imposed where, as here, any breach was based on a reading of the governing documents that is not plainly unreasonable, even if it may ultimately be erroneous. Nor may forfeiture be awarded when alternative remedies exist to cure any prejudice to a landlord from the breach. Here, payment of rent (with interest for any delay) would make Landlord whole. In fact, D.C. law allows a tenant who breached the lease by nonpayment of rent to tender the payment and retain the lease any time before a landlord redeems a judgment of possession. The district court ordered exactly this alternative remedy, requiring Tenant to pay Landlord $1,475,000. But it still imposed forfeiture in addition to the forfeiture alternative. Either of the above is dispositive as a matter of law. In addition, none of the other equitable factors can support an award of forfeiture in the circumstances here, which include Landlord's refusal to cooperate in resolving the ambiguities as to the payment deadline and the identity of the payee, and its failure to provide a reasonable period of time to comply. The district court's judgment must be reversed.

# ARGUMENT

## I. STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo*. *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008). Summary judgment is only appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine dispute of material fact exists, the Court views the evidence "in a light most favorable to the nonmoving party," *Hampton v. Vilsack*, 685 F.3d 1096, 1099 (D.C. Cir. 2012) (internal quotation marks omitted), drawing all reasonable inferences in the nonmoving party's favor, *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 575 (D.C. Cir. 2010).

Where an equitable remedy is at issue, this Court reviews *de novo* "the existence of material facts in dispute." *Pro Football, Inc. v. Harjo*, 565 F.3d 880, 883 (D.C. Cir. 2009). The Court also reviews *de novo*, as always, "'questions of law.'" *See Solomon v. Vilsack*, 628 F.3d 555, 561 (D.C. Cir. 2010) (quoting *United States v. Berry*, 618 F.3d 13, 16 (D.C. Cir. 2010)); *see also City of Las Vegas v. Lujan*, 891 F.2d 927, 931 (D.C. Cir. 1989) (reviewing *de novo* trial court's refusal to grant injunctive relief as a matter of law). The Court reviews for abuse of discretion a question not implicated here, "how to apply the equitable principles . . . to the undisputed facts." *See Pro Football,*

17

*Inc.*, 565 F.3d at 883. Given the district court's error as to the existence of material facts in dispute and in interpreting the law as to forfeiture, only *de novo* review is applicable.

## II. THE DISTRICT COURT ERRED IN HOLDING THAT THERE IS NO DISPUTE OF MATERIAL FACT AS TO WHETHER TENANT VIOLATED ITS PAYMENT OBLIGATION UNDER THE LEASE

### A. The Rent Payment Was Not Due on May 30, 2013

Tenant did not breach its contractual obligations because the deadline for the $1,475,000 payment had not arrived at the time Landlord sent its default notice. Originally, Tenant's payment had been due on March 15, 2011 (or potentially earlier upon the happening of a triggering event that did not come to pass). *See* J.A. 60 (§ 2.1(b)); *id.* at 57 (¶ e).

Given the economic conditions affecting the Project (and commercial development throughout the country) the parties first agreed to postpone the due date for this payment until December 2011. *See id.* at 357 (¶ 22); *id.* at 299.

On April 6, 2012, the parties executed a signed writing that again modified the timetable for the rent payment. That agreement (the "Term Sheet") provided that "(a) no later than ten (10) days after execution of this Term Sheet, a payment of $100,000 will be made, and (b) the balance of $1,375,000 will be paid no later than ninety (90) days after the execution of the Ground Lease and Development Agreement Amendments ['Second Amendments']."

18

*Id.* at 305 (¶ 4). Pursuant to this agreement, the vast majority of the $1,475,000 payment was due ninety days after the execution of the Second Amendments.[5] To date, the Second Amendments have not been executed. Accordingly, the bargained-for date of payment has yet to arrive.

1. The Term Sheet, "an agreement in writing signed and acknowledged" by authorized representatives of Landlord and Tenant, and which refers expressly to the Ground Lease, *see* J.A. 304, constitutes a modification of the Lease. *See id.* at 116 (§ 23.2); *see also Hershon v. Hellman Co.*, 565 A.2d 282, 283 (D.C. 1989) (per curiam) (recognizing that parties may modify their prior agreements by mutual consent where the modification is supported by consideration (citing *Nyhus v. Travel Mgmt. Corp.*, 466 F.2d 440, 445 (D.C. Cir. 1972))).

Indeed, the Term Sheet is an enforceable contract between the parties. Under D.C. law—which governs the interpretation of these documents, *see* J.A. 118 (§ 27.6)—"[f]or a contract to be enforceable" there must be an "intention of the parties to be bound," "mutuality of obligation," and "an agreement to all material terms." *EastBanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A.2d 996, 1002 (D.C. 2008) (internal quotation marks omitted).

---

[5] The $100,000 was not paid, but—consistent with the parties' subsequent anticipation that the entire $1,475,000 would be due on a date certain after the execution of the Second Amendments, *see* J.A. 316 (¶ 4)—Landlord did not demand this payment.

The Term Sheet manifests the parties' intent to be bound. The Term Sheet ends with the words "AGREED AND ACCEPTED," unequivocally expressing this intent. *See* J.A. 306. It provides that the notices of default "are *hereby* withdrawn." *Id.* at 304 (emphasis added). And it establishes an immediate agreement as to the new timetable for the rent payment, stating that the timetable "*is* defined herein," and that the "new timetable . . . *is* as follows." *Id.* (emphases added). In the paragraph addressing the timing of the $1,475,000 payment in particular, the Term Sheet states that the schedule "*shall be* as follows." *Id.* at 305 (¶ 4) (emphasis added). This list of agreed and accepted terms ends with the signature of both Tenant's and Landlord's representatives. *See Duffy v. Duffy*, 881 A.2d 630, 637 (D.C. 2005) ("Both appellant and appellee signed the Letter, the clearest evidence of mutual assent to the terms of the document.").

The Term Sheet also reflects a mutuality of obligation, that is "[e]ach party undertook to do something it would otherwise have no legal obligation to do." *EastBanc*, 940 A.2d at 1004. For example, Landlord agreed to immediately withdraw the two default notices, and Tenant agreed to release $525,000 to Landlord by terminating the Escrow Agreement.

Finally, the Term Sheet contained an agreement as to all material terms because it memorialized "respective obligations of the parties" in a manner "clear enough that each could be reasonably certain how it was to

20

perform." *Id.* at 1002-03. As an initial matter, the Term Sheet acted as a modification of the parties' existing contractual duties. To the extent any term that could be deemed material was not supplied by the Term Sheet, that term was supplied by the existing agreements. As for the terms relevant here, the Term Sheet effected immediate withdrawal of the default and termination notices and required Tenant to pay the rent in full ninety days after a specific triggering event, *see* J.A. 304-05, memorializing these agreements in a manner that made each party's course of performance pellucid. *See EastBanc*, 940 A.2d at 1002-03.

The Term Sheet also committed the parties to executing certain documents at future dates and engaging in review and negotiations of other issues. Insofar as agreement as to these steps is required, it is of no moment that these steps could entail additional negotiation and the documents referenced could take different forms. "The enforceability of the agreement comes from the definitive character of the *obligation* to perform, not a precise description of the ways in which the obligation might be fulfilled." *EastBanc*, 940 A.2d at 1003; *see also Dyer v. Bilaal*, 983 A.2d 349, 357 (D.C. 2009) ("a price term is not necessarily indefinite because the agreement leaves fixing the amount for the future" (ellipsis and internal quotation marks omitted)). By agreeing to execute documents on a future date, the parties took on a specific, enforceable obligation to engage in good-faith negotiation about any

21

open issues. *See Stanford Hotels Corp. v. Potomac Creek Assocs., L.P.*, 18 A.3d 725, 735-36, 739 (D.C. 2011) (recognizing that parties may take on an "obligation to negotiate the open issues in good faith in an attempt to reach the [ultimate] objective within the agreed framework," and that such an obligation is not only enforceable, but may be "definite and certain" enough to be enforced by specific performance (internal quotation marks omitted)).

Insofar as any doubt remains, the parties' subsequent actions establish the binding nature of the Term Sheet. The parties acted in reliance on the Term Sheet, executing a Termination of Escrow Agreement, and releasing $525,000 that had been held in escrow for Landlord's immediate use. In other words, the Term Sheet's agreements were partially performed, and "partial performance is an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it also understands a contract to be in effect." *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75-76 (2d Cir. 1984); *see also* 1 Arthur Linton Corbin, Corbin on Contracts § 2.9, at 155 (rev. ed. 1993) ("[T]he subsequent conduct of the parties may constitute a tacit contract on the terms previously agreed upon, even though the understanding at first had been that the execution of a formal document was necessary."). And Tenant took other actions in reliance on the parties' agreement to move forward, "continu[ing] to spend money daily" on the Project. *See* J.A. 312; *see also id.* at 357 (¶ 20) ($2,000,000 ex-

pended through April 2013).

Because the Second Amendments have not been executed, the governing date for the payment of the $1,475,000 was "ninety (90) days after" an event that had not yet occurred. The deadline therefore had not passed on June 3, 2013, when Landlord sent Tenant the default notice.

2. The Second Amendments would have required a May 30, 2013, due date, had Landlord executed them. *See* J.A. 316 (¶ 4). They also would have provided Tenant with an array of benefits, including protections to ensure Landlord made the payments required of it for site remediation and an extended set of construction-related deadlines. *See id.* at 315-17 (¶¶ 3, 5-6, 8). But, despite the parties' agreement to execute the Second Amendments, Landlord declined to do so. This meant both that the Term Sheet was the latest signed writing governing the payment due date and that a condition precedent to the Term Sheet's payment deadline had not occurred.

3. The district court's decision is premised on a determination that the "understanding of the parties as shown in their correspondence" was that the payment "was due no later than May 30, 2013." J.A. 475. That predicate is incorrect. The correspondence referenced the May 30 deadline, but always in connection with the assumption that the Second Amendments (which would have established that deadline) would be signed prior to that date. *See id.* at 312 ("payment of $1,475,000" due on May 30, 2013, "pursuant to Paragraph

23

11 of the Second Amendment"); *id.* (referring to obligation to make payment by May 30 "under this Second Amendment"); *see also id.* at 443 (¶ 24) (letter written "in the context of ongoing discussions" that payment was to be made "pursuant to the Second Amendment documents"). Evidence in the record squarely supports a finding that the May 30 deadline was contingent on the execution of the Second Amendments that never came. *See id.* at 438-39 (¶ 14) ("The term sheet provides that the payment would be made within 90 days after execution of the Second Amendment documents."); *id.* at 443 (¶ 23) ("Payment of the $1,475,000 was conditioned on the execution of the Second Amendments to the Ground Lease and Development Agreement."). At the very least, there is a genuine dispute of fact as to this critical issue.

The district court further noted that "the May 30, 2013 deadline was sought by the plaintiff in the Second Amendments." *Id.* at 474. That is true as far as it goes—Tenant preferred to have the parties sign the Second Amendments, which granted Tenant key protections in exchange for other concessions. *See id.* at 358 (¶ 27). The Second Amendments would have set up a system for Landlord to pay for environmental remediation without the escrow mechanism and would give Tenant a right to offset unpaid amounts (with interest) against its rent obligations. *See id.* at 315 (¶ 3). Moreover, they would have fixed a new date for Tenant's time to perform its development obligations, ensuring that after making the rent payment, Tenant would be able

24

to meet the construction timetable. *See id.* at 316-17 (¶¶ 5-6, 8). But Landlord refused to sign the Second Amendments. And Tenant had no obligation to give the *quid* without receiving the *quo*.[6]

### B. To the Extent a Rent Payment Was Due on May 30, 2013, It Was Payable into an Escrow Account Landlord Refused To Establish, Making Performance Impossible

Not only was payment by May 30, 2013, not required given Landlord's

---

[6] The district court also stated that plaintiff "cannot have this both ways," arguing both that the Term Sheet was immaterial and should be stricken and that it delayed the due date of the second payment. *See* J.A. 474. But the district court declined Tenant's request that the Term Sheet be "stricken" from the record, and Tenant was fully entitled to argue in the alternative. *Compare* Pl.'s Opp'n to Mot. for Summ. J. at 7 n.8, No. 13-1075 (Sept. 19, 2013) ("Pl.'s Opp'n") ("[A]ny reference . . . to the Term Sheet . . . should be stricken. However, if this Court is inclined to consider [the Term Sheet], its import is discussed, *infra*, in further detail."), *with* J.A. 472 n.7 ("The plaintiff's request to strike this Term Sheet is denied.").

Tenant fully presented its alternative argument, specifically contending that May 30, 2013, was the deadline for the payment only "subject to the execution of [the] second amendment." Pl.'s Opp'n at 8; *see also id.* at 21 n.16 ("If the Term Sheet controls . . . the remaining $1,375,000 Payment was not due until ninety (90) days after the execution of the Second Amendment documents. Since the Second Amendment documents to this day have not been executed, the Payment has yet to become due."); *id.* at 24 n.17 ("If the Term Sheet controls, then . . . the time to cure has not even begun."). Landlord joined issue and responded to this argument in its reply brief. *See* Def.'s Reply in Supp. Summ. J. at 9, No. 13-1075 (Oct. 25, 2013). The argument was fairly presented, and it is black letter law that "a party that presents two alternative arguments abandons neither." *Aera Energy LLC v. Salazar*, 642 F.3d 212, 220 (D.C. Cir. 2011) (alterations and internal quotation marks omitted).

failure to execute the Second Amendments, but it was also impossible under the governing documents without further cooperation from Landlord. As explained below, with the Second Amendments unexecuted, the Amendment to the Development Agreement governed the payee for the $1,475,000 payment. The Amendment required the parties to establish an escrow account in order to ensure that Landlord would meet its environmental remediation obligations, and it directed the Tenant to make the $1,475,000 payment, when due under the Ground Lease, to an escrow agent. *See* J.A. 265 (¶ 6(c)(i)).

After the Term Sheet was executed, however, the parties terminated the escrow account they had established and Regional Title Incorporated's role as escrow agent. So on May 30, 2013, the escrow account required by the Amendment to the Development Agreement had ceased to exist, and to the extent the governing agreements required payment, it was due to a nonexistent entity. If executed, the Second Amendments would have redressed this Alice-in-Wonderland quandary, for—while granting Tenant key protections—they would have made Landlord, rather than an escrow agent, the payee. *See id.* at 315-16 (¶¶ 3-4).

\*     \*     \*

Tenant's bind becomes apparent when the agreements are taken step by step. The Amendment to the Development Agreement provided that "[u]pon the execution of this Amendment," the parties "shall establish an es-

crow account . . . with an escrow agent ('Escrow Agent') reasonably accepta-
ble" to both. *See* J.A. 265 (¶ 6(c)(i)). The Amendment further provided that
the escrow account must have certain features, for instance that it be an in-
terest-bearing account in a federally insured institution. *Id.* It also obligated
Tenant to "deposit into the Escrow Account . . . by direct payment . . . to Es-
crow Agent" both the $525,000 and the $1,475,000 when due under the
Ground Lease. *Id.*

The parties then executed an Escrow Agreement with Regional Title
Incorporated, appointing it as Escrow Agent, and providing for disburse-
ment of the deposited amounts to an entity responsible for environmental
remediation. *See id.* at 269-70. The Escrow Agreement provided that
$1,475,000 would be deposited with Escrow Agent at a later date. *See id.* at
269 (¶ D). Tenant paid the initial $525,000 to the Escrow Agent.

Landlord and Tenant subsequently executed the Term Sheet, agreeing
to "[e]xecute [an] amendment to [the] Escrow [A]greement such that
*$525,000 held in escrow* for the purposes of environmental remediation will
be released." *Id.* at 305 (¶ 3) (emphasis added). The Term Sheet said nothing
about the identity of the payee for the future $1,475,000 rent payment. *See
id.* at 304-06.

Tenant, Landlord, and Regional Title Incorporated then executed a
Termination of Escrow Agreement. As required by the Term Sheet, the

Termination Agreement directed the Escrow Agent to release the funds currently in the escrow account to Landlord. *See id.* at 307-08. It also released Regional, the Escrow Agent, as escrowee and terminated the escrow account. *Id.* at 307. Notably, the Termination Agreement did not purport to amend the Amendment to the Development Agreement. To the contrary, the Termination Agreement mentioned the Amendment to the Development Agreement and the Escrow Agreement, but purported to modify only the latter. *See id.* The Termination Agreement said nothing about the identity of the payee for future rent payments. Nor did it mention the $1,475,000 payment. It accomplished precisely what the Term Sheet required—release of the balance of the $525,000 payment—and stopped there. *See id.* at 307-08.

Just as the Escrow Agreement did not create the obligation to pay funds into an escrow account, the Termination Agreement did not terminate it. Rather, the parties anticipated executing the Second Amendments, which would accomplish this (among other things). And in fact the unexecuted Second Amendments provided that "the second payment of Rent under Section 2(a)(ii) of the Lease (being the sum of $1,475,000.00) . . . shall be payable directly to the University and shall not be paid to or held by Escrow Agent." *See id.* at 316 (¶4). Had the Second Amendments been signed, there is no question that Landlord would have become the payee. But Landlord refused to sign.

28

Under the provisions governing as of May 30, 2013, the Tenant was required to deposit the $1,475,000—when it became due—"into the Escrow Account" "by direct payment by [Tenant] to Escrow Agent." *See id.* at 265 (¶ 6(c)(i)). Contrary to these terms, Landlord sent a notice on June 3, 2013, demanding "payment in full of the sum of $1,475,000 by the [Tenant] *to the University* within ten (10) days after this notice." *Id.* at 344 (emphasis added) (some capitalization omitted). No amount, however, was due to be paid to the University, as no written modification to the Ground Lease or Amendment to the Development Agreement addressing the payee had occurred. *See id.* at 116 (§ 23.2) (providing that Lease "cannot be changed orally," but only "by an agreement in writing signed and acknowledged by Landlord and Tenant").

Assuming the deadline for the payment had arrived, Tenant's obligation under the governing provisions was to pay the Escrow Agent. But the parties had terminated the Escrow Agent "reasonably acceptable to the [Landlord] and [Tenant]" addressed in Section 6(c)(i) of the Amendment, *id.* at 265 (¶ 6(c)(i)). And Tenant was unable to make direct payment to an entity—the Escrow Agent—that did not, at that moment, exist. *See E. Capitol View Cmty. Dev. Corp. v. Robinson*, 941 A.2d 1036, 1040 (D.C. 2008) ("where performance is objectively impossible—that is, the contract is incapable of performance by anyone" courts will generally "excuse non-performance").

29

The order in which the parties executed the documents, resulting in this conundrum, was doubtless inartful. Once it arose, though, the situation could have been remedied with little difficulty. But—although it demanded the payment—Landlord refused to cooperate, either by executing the Second Amendments (which would have eliminated the escrow requirement), or by entering into a new escrow agreement that would allow Tenant to tender payment in compliance with the executed documents. *See id.* at 360 (¶ 36 & n.7); *id.* at 443 (¶ 27).

Landlord's refusal is particularly stark because it is well established under D.C. law that every contract has an "implied covenant of good faith and fair dealing," *Hais v. Smith*, 547 A.2d 986, 987 (D.C. 1988) (per curiam) (internal quotation marks omitted), which bars "interference with or failure to cooperate in the other party's performance," *see* Restatement (Second) of Contracts § 205 cmt. d (1981); *see also Hais*, 547 A.2d at 987-88. In light of Landlord's noncooperation, Tenant's failure to make a payment to the nonexistent entity required by the Amendment can hardly constitute a breach. *See In re Estate of Drake*, 4 A.3d 450, 454 (D.C. 2010) ("It is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure." (internal quotation marks omitted)); *see also Horlick v. Wright*, 104 A.2d 825, 827 (D.C.

1954) ("having prevented performance by the [appellants], [the appellee] cannot now be permitted to claim that they had defaulted").

## III. LANDLORD FAILED TO COMPLY WITH THE NOTICE PRO-VISION APPLICABLE TO A TERMINATION OF THE GROUND LEASE, AND TENANT MADE PAYMENT PRIOR TO THE EX-PIRATION OF ANY CURE PERIOD

Yet another problem makes any purported termination improper: Landlord failed to comply with the notice provision applicable to the termination of the Ground Lease, and Tenant adequately cured any default.

A. The Ground Lease provides for two separate notice periods where the Landlord seeks to terminate the agreement. First, the Lease defines as an "Event of Default" the failure to make a payment that continues "for a period of ten (10) days after written notice from Landlord to Tenant." *See* J.A. 104-05 (§ 16.2). That is, a failure to make a rental payment (a little "d" default) becomes, after failure to cure within ten days of notice, an "Event of Default."

Second, after such an Event of Default has occurred, if Landlord seeks to terminate the Lease "on account of any Event of Default," Landlord must provide "a written notice (*in addition to* any notice of default provided for in this Section 16.2 . . . )" specifying that it "intends to terminate the Lease if the Event of Default is not cured within ten (10) days." *Id.* at 105 (§ 16.2(c)) (emphasis added). Only "[u]pon the expiration of such ten (10) day period,

and if such Event of Default has not been cured" may the Landlord seek to terminate the Lease. *Id.*

To the extent a rental payment was due May 30, 2013, Landlord was required to first send a notice of default. If, after ten days the nonpayment was not cured and thus an Event of Default occurred, it could *then* send a notice of termination with a further ten-day cure period. Landlord did not comply with these terms. Instead, Landlord sent one notice titled both "Notice of Default" and "Notice of Intent to Terminate." *See id.* at 344. That June 3 notice did not satisfy Landlord's notice of intent to terminate obligations under the Lease, which requires such a notice to be sent only after there has been an "Event of Default." Here, assuming payment was due May 30, an Event of Default occurred after ten days elapsed from the June 3 notice without payment, *viz.*, on June 14, 2013.

Landlord's prior actions recognized that there were two distinct notices and cure periods. After Tenant missed a purported deadline for payment (December 8, 2011), Landlord sent a notice stating, as to the rent payment, that if payment is not made "within ten (10) days after this notice, then such failure shall also constitute an Event of Default." *Id.* at 299 (some capitalization omitted). Then, more than ten days later, Landlord sent a second notice saying that the nonpayment of rent "now constitutes an Event of Default" and that the University intends to terminate the Lease "if this Event of De-

fault is not cured within ten (10) days." *Id.* at 302 (some capitalization omitted). (Both of these notices were, of course, revoked by Landlord after subsequent negotiations so cannot constitute adequate notice for termination based on the May 30, 2013, nonpayment.) Apparently overeager to extinguish the Lease in June 2013, Landlord failed to follow this two-step approach. This failure invalidates any purported termination of the Lease under the document's plain text.

B. In all events, Tenant reasonably cured any purported basis for termination. Faced with a Notice of Default and Landlord's noncooperation as to the creation of an escrow account, Tenant made a good-faith effort to resolve the situation in a reasonable manner. Tenant set up an escrow agreement with Closeline Settlements and caused $1,475,000 to be deposited into that account on June 19, 2013, even without benefitting from the important protections the Second Amendments would have provided. *See id.* at 361 (¶ 41). The escrow agreement, directing deposit into an interest-bearing account, sought to comply with the terms of the Amendment independent of Landlord's participation. *See id.* at 443 (¶ 27). And the funds were available for use in accordance with the Second Amendments (once executed) or for transfer into an escrow arrangement acceptable to both parties. Viewing the record in the light most favorable to Tenant, this payment sufficiently effectuated the Amendment's requirements and was reasonable in light of Land-

lord's noncooperation.

The district court held that the payment came too late because Tenant only had ten days to cure under the Ground Lease. Landlord sent a notice of default on June 3, 2013, and the payment was deposited into escrow on June 19, sixteen days after the notice of default was mailed, and so six days too late in the district court's eyes. Assuming that the Ground Lease's cure period in fact governed—a point Tenant does not contest on appeal—the district court's conclusion is nonetheless erroneous because the ten-day cure period could only have commenced once an Event of Default occurred, *see id.* at 105 (§ 16.2(c)), i.e., no earlier than June 14, and so could not have expired before June 24. Tenant's cure on June 19 was thus both reasonable and timely.

## IV.  EVEN ASSUMING THAT TENANT BREACHED, THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT AS TO FORFEITURE

To summarize: Tenant was not obligated to make the payment on May 30, 2013, because the agreement that would have imposed that deadline was not executed and the governing agreement—the Term Sheet—provided for payment 90 days after a triggering event that had not occurred. Independently, Tenant was not obligated to make the payment because the payee specified by the governing provisions no longer existed, and the Landlord refused to sign a document that would amend the requirement and refused to cooperate in establishing a new escrow account. Finally, the Landlord failed

to provide the notice required by the Ground Lease for termination. In an attempt to resolve this situation—and despite being deprived of the other assurances of the Second Amendments—Tenant had the payment placed into an escrow account of its own creation mere days after Landlord asserted it was due.

To say the least about the state of affairs, uncertainty abounded about Tenant's duties, the governing deadlines, the identity of the payee, and the cure period for any payment owed. Nonetheless, the district court held that forfeiture should be imposed on the Tenant. *See* J.A. 491 ("Forfeiture Is An Appropriate Remedy"). In granting the remedy of forfeiture, the district court failed to recognize critical disputed facts and gravely misapplied the law.[7]

The district court's decision flouts two well-established lines of District of Columbia law. First, and most critically, District of Columbia law sharply disfavors forfeiture as a remedy. "[F]orfeitures are a 'harsh and disfavored sanction' and 'will not be enforced unless there are circumstances which

---

[7] Because the district court's analysis was based on erroneous legal reasoning and a failure to construe factual disputes in Tenant's favor, this decision implicates only *de novo* review. *See Pro Football, Inc. v. Harjo*, 565 F.3d 880, 883 (D.C. Cir. 2009). Regardless, "a district court abuses its discretion when it makes an error of law," *Kellmer v. Raines*, 674 F.3d 848, 851 (D.C. Cir. 2012) (internal quotation marks omitted), so Tenant should prevail no matter the standard of review.

make them reasonably proper for the protection of rights which would be otherwise impaired.'" *Shapiro v. Tauber*, 575 A.2d 297, 300 (D.C. 1990) (quoting *Entrepreneur, Ltd. v. Yasuna*, 498 A.2d 1151, 1164 (D.C. 1985)); *see also Ass'n of Am. R.R.s v. Connerton*, 723 A.2d 858, 862 (D.C. 1999) ("[E]quity abhors forfeitures; so, indeed, does the law." (citation and internal quotation marks omitted)). This principle applies to leases of "commercial rental propert[ies]"—indeed that was the type of lease at issue in *Shapiro* itself. *See* 575 A.2d at 297-98. And it governs *despite contractual language to the contrary*: "A breach by a tenant must be a violation of a substantial obligation to be enforceable by forfeiture, notwithstanding the inclusion in a lease of a clause purporting to permit termination in case of any breach." *Yasuna*, 498 A.2d at 1161 (internal quotation marks omitted).[8]

Second, where the breach at issue is a nonpayment of rent, District of Columbia law provides broad opportunities to cure that breach: it relieves a tenant from forfeiture if he cures *any time before the landlord redeems*, that is executes a judgment of possession. *See Trans-Lux Radio City Corp. v. Serv. Parking Corp.*, 54 A.2d 144, 146 (D.C. 1947). "It is well established that as a general rule equity will relieve against a forfeiture caused by nonpay-

---

[8] Anticipating the potential invalidity of some of the terms, the Lease contains a severability clause. *See* J.A. 113 (§ 20.1) (if any term "shall to any extent be invalid or unenforceable, the remainder of this Lease . . . shall not be affected thereby").

36

ment of rent unless it is unjust or inequitable to do so, the only condition precedent to such relief being the tender or payment of the arrears with accrued interest." *Burrows Motor Co. v. Davis*, 76 A.2d 163, 165 (D.C. 1950) (footnote omitted). Here, the district court granted Landlord forfeiture while ordering payment of the disputed rent. In effect, then, the district court ordered Tenant to cure in a way that itself defeats forfeiture under District of Columbia law while simultaneously imposing forfeiture.

*      *      *

In *Yasuna*, the D.C. Court of Appeals laid out a number of factors that courts must consider before imposing forfeiture, including whether "the breach was willful or committed by inadvertence or mistake," "the lessee acted in good faith," "one of the parties has violated fundamental principles of fair dealing under the lease," "the landlord has given adequate notice to the tenant of the default and has given the tenant a reasonable period to comply," and "any prejudice has accrued to the landlord by reason of the breach." *See* 498 A.2d at 1160-61 (internal quotation marks omitted). Properly interpreted, these factors prohibit forfeiture on this record.

## A. Willfulness and Good Faith

Any breach here was far from willful. Willfulness requires "disregarding a 'clearly defined' obligation." *Shapiro*, 575 A.2d at 300 (citation omitted). "[R]elying in good faith upon a reading of the lease that was not plainly un-

37

reasonable, though it may prove to be mistaken," precludes a finding of "the willfulness . . . that *Yasuna* deemed significant in justifying forfeiture." *Id.*; *see also Trans-Lux*, 54 A.2d at 146 (where tenant acts on a legal position that is "neither fanciful nor arbitrary," a resulting "default in payment of rent" is not a "willful default").

Tenant's obligation to pay Landlord by May 30, 2013, was hardly clearly defined. To the contrary, as demonstrated above, the May 30 deadline hinged on execution of the Second Amendments, which had not occurred by the time the would-be deadline came and went. Additionally (and separately) the obligation was not "clearly defined" because the identity of the payee was in flux—the governing document required payment to an entity that no longer existed, and the document that would have terminated that obligation was not executed due to Landlord's noncooperation.

Two further sources of ambiguity reigned.

1.     First, Tenant believed in good faith that it had twenty days, rather than ten, to cure any nonpayment of rent (and that it was then entitled to a second twenty-day cure period before the Lease could be terminated, *see* J.A. 355 (¶13)). Tenant ardently pressed the length-of-cure-period issue below. In a nutshell, the Tenant's reading was based on the following:

The Ground Lease, which governed aspects of the parties' agreement, required Landlord to provide a ten-day cure period for any nonpayment be-

fore deeming it an Event of Default. The Development Agreement, which governed other aspects of the parties' agreement, required Landlord to provide a twenty-day cure period. *Id.* at 186 (§ 5.1(g)). The parties disagreed as to which cure period—the Ground Lease's or the Development Agreement's—applied to Tenant's obligation to pay rent at the time of the purported breach.

The obligation to pay $1,475,000 originated in the Ground Lease. The Amendment to the Development Agreement modified that obligation, replacing the obligation to pay $1,475,000 to Landlord with an obligation to pay the same amount to an Escrow Agent. The payment to the Escrow Agent served to replace the payment to Landlord: the Escrow Agreement expressly provided for payment of $1,475,000 to Escrow Agent "in lieu of" the amount payable to Landlord "under Section 2.1(b) of the Lease." *Id.* at 269 (¶ D). Therefore, because double payment was never anticipated by the parties, Tenant's duty to pay Landlord (which had been set out in the Ground Lease) was extinguished by the amended Development Agreement's requirement that Tenant pay $1,475,000 to an escrow agent. Indeed, the Amendment to the Development Agreement provided that Ground Lease obligations "[e]xcept as otherwise expressly provided herein" should be incorporated, thereby allowing those expressly addressed (like the payment of $1,475,000) to be extinguished and replaced. *See id.* at 267 (¶ 7).

Since, under this view, the operative payment obligation was a duty under the Development Agreement, as amended, and not under the Ground Lease, the Development Agreement's cure provisions governed. The Development Agreement deemed it an Event of Default not to pay "any amount payable by [Tenant] hereunder within twenty (20) days after receipt of written notice of such failure." *Id.* at 186 (§ 5.1(g)). If Tenant failed to pay the $1,475,000 due under the Development Agreement, an Event of Default occurred twenty-one days after the June 3, 2013, notice, or on June 24. (In turn, that Event of Default could only support termination after a second notice and additional twenty-day cure period, *see id.* at 186 (§ 5.2(b))). This argument is further bolstered by the fact that "leases are strictly construed against the party claiming forfeiture," *Yasuna*, 498 A.2d at 1160.

While Tenant is no longer arguing that this interpretation is the best reading of the agreements, and so is not pressing this argument as an independent ground for finding that no breach occurred, Tenant held this interpretation in good faith at the time of alleged breach and during proceedings in the district court. *See* J.A. 36 (¶ 35 & n.6). And although the district court ultimately rejected this argument, it acknowledged that the interplay between agreements as to the cure provision was "curious," *id.* at 392. Counsel for Landlord also conceded that the relationship between the documents governing the $1,475,000 payment was "curious" and "very . . . inartful." *Id.*

40

392-93; *see also id.* at 387 (Court noting that "there's a huge dispute about whether [the cure] provision of the [G]round Lease is the operative language anymore post agreement").

Because of this ambiguity, Tenant had a good-faith belief that, even if the payment was due on May 30, it would have twenty days after Landlord's notice to cure any nonpayment before an Event of Default even occurred.

2. Second, the unexpected historic designation issue added to the uncertainty regarding the parties' rights. On May 6, 2013, the District of Columbia Historic Preservation Review Board designated two buildings on the leased property as historic landmarks. J.A. 358-59 (¶ 30). By preventing demolition of the buildings, it precluded the development as envisioned by the parties. The Development Agreement expressly states that "the Project Improvements shall be consistent with the DUKE Plan." *See id.* at 170 (§ 3.1(a)). The DUKE Plan did not include any historic designation for these buildings. *See* D.C. Office of Planning, *DUKE: Draft Development Framework for a Cultural Destination District Within Washington, DC's Greater Shaw / U Street* (Sept. 2004), *available at* http://tinyurl.com/mg76ynn. It required preservation of only part of the facade of one structure on the parcel. *Id.* at 30; *see also* J.A. 342. At the time of the designation, Tenant had invested roughly $1,000,000 in architectural drawings that would comply with the DUKE Plan (and consequently the Development Agreement). *See* J.A. 342.

41

The historic designation precluded Tenant from proceeding pursuant to this design. *See id.*

Tenant was reasonable in its view that Landlord should cooperate in good faith to address this difficulty before Tenant tendered payment for a Lease that, due to an unanticipated development, vitiated the preparations that Tenant had made pursuant to the Development Agreement, and would require millions of dollars of unanticipated costs for Tenant to accommodate without redefining the bounds of the parcel. *See id.* at 359 (¶ 31) (estimating cost of $14,000,000); *Hais*, 547 A.2d at 987 (every contract has "an implied covenant of good faith and fair dealing" (internal quotation marks omitted)).

Further demonstrating its good faith in the face of ambiguity, Tenant itself expended substantial resources to redesign the project to comply with the historic designation, and was scheduled to present the design for approval at a Historic Preservation Review Board hearing scheduled for June 27, 2013. *See* J.A. 359 (¶ 31).

Given the marked absence of clarity as to its obligations in the circumstances and the myriad ways that a "good faith . . . reading of the lease that was not plainly unreasonable" led Tenant to conclude that it was complying with its obligations, Tenant's nonpayment reflected no "willfulness—in the sense of disregarding a 'clearly defined' obligation—or bad faith" needed to justify forfeiture under D.C. law. *See Shapiro*, 575 A.2d at 300. The district

42

court's view that there are no genuine disputes of material fact to the contrary ignores the record and flouts these legal principles.

### B. *Fundamental Principles of Fair Dealing*

Turning to the related question whether "one of the parties has violated fundamental principles of fair dealing under the lease," *Yasuna*, 498 A.2d at 1160 (internal quotation marks omitted), Tenant is again vindicated. The record illustrates Tenant's good-faith efforts, and Landlord's problematic refusal to cooperate, *see* J.A. 438 (¶ 14) (delay in executing Second Amendments was result of Landlord "fail[ing] to return . . . until late March 2013" the drafts Tenant submitted); *id.* at 443 (¶ 27) (Tenant set up escrow account "because [Landlord] refused to cooperate"); *id.* at 358 (¶ 27) (despite Tenant's "efforts and repeated requests to [Landlord], [Landlord] failed and refused to execute the Second Amendment[s]"); *id.* at 359 (¶ 33) (Landlord "did not respond to the request" to amend payment date in light of historic designation).

Landlord violated fundamental principles of fair dealing by refusing to sign the Second Amendments as the parties had agreed, by refusing to cooperate about the historic designation, and by refusing, after sending Tenant a notice of default, to cooperate in setting up an escrow account that would allow Tenant to make a complying payment. *See id.* at 359-61 (¶¶ 33, 36, 37, 40). Landlord's violation of these principles—and Tenant's comportment with

them—prohibits forfeiture. *See Yasuna*, 498 A.2d at 1160.

The same conclusion obtains on a bird's-eye view. Recognizing the thorny reality of major development projects, the parties moved deadlines and made accommodations for circumstances as they arose. They were negotiating these challenges in good faith, and taking action in reliance on these good-faith negotiations. Tenant, in particular, agreed to terminate the escrow agreement that existed for its protection, and continued to invest substantial money and time into the Project.

In contrast, as the economy improved—bringing with it the potential for a better offer—Landlord stonewalled, declining to sign the Second Amendments, cooperate on the historic designation, or even set up a viable payment method after mailing a default notice in its rush to oust Tenant. In short, Landlord began looking for any excuse to terminate the Lease, notwithstanding the millions of dollars expended by Tenant to date and the legal rights that Tenant had under the existing agreements. Notably, as Tenant sought to collaborate with Landlord to resolve the purported termination, Landlord made it a point to inform Tenant that five other developers had contacted it about the project. J.A. 361 (¶ 40). Under these circumstances, the equities are aligned against forfeiture.

Also significant to this factor is the extent of what Tenant stands to lose. *Shapiro* considered, among other factors, that the action was filed "only

44

fifteen months into a twenty-five year lease," 575 A.2d at 300, and that the tenants "had invested a substantial amount of money in their respective businesses." *Id.* This action was filed less than four years into a *ninety-nine-year* lease, after Tenant invested millions of dollars and vast efforts into the Project. Forfeiture would void Tenant's property interests in the remaining ninety-five years of the Lease term and Tenant's valuable right of first offer to purchase the parcel. *See* J.A. 123 (§ 29.1). Forfeiture would result in a massive windfall to Landlord where the rent payment was made just six days late (under the best interpretation of the operative documents for Landlord), and there is no evidence of any harm caused by the delay.

### C. Reasonable Opportunity To Comply

Further, "[c]ourts that have enforced forfeitures have done so only where the record is clear that the landlord . . . has given the tenant a reasonable period to comply." *Yasuna*, 498 A.2d at 1161. The ten-day period provided was *per se* unreasonable in this case because the Lease required Landlord to provide two ten-day periods, *see supra* Part III.A. But even putting aside the provisions of the agreements, given the non-existence of the escrow account, a set of Second Amendments that remained under discussion, and the swirl of uncertainty surrounding the Project, *see supra* Part IV.A, ten days' notice was independently unreasonable.

45

*D. Prejudice to Landlord*

In addition to the ambiguity, Tenant's good faith, and Landlord's questionable conduct, forfeiture is improper here because there was no prejudice to Landlord from the asserted six-day delay. "Forfeiture is unnecessary . . . to vindicate any substantial right of the [landlords]" where tenant ultimately cured and so "no damage has accrued to them by virtue of the breach." *Yasuna*, 498 A.2d at 1164. Accordingly, in assessing the propriety of forfeiture, the D.C. Court of Appeals has noted, "[m]ost important, perhaps, is [whether] alternative remedies exist to make [the landlord] whole if the lease was breached." *Shapiro*, 575 A.2d at 300.

1. There is not a scintilla of evidence in the record that the delay here harmed Landlord in any way. To the contrary, the original agreements provided that Landlord would have no access to the $1,475,000 payment until after construction began and excavation and remediation were concluded and paid for. *See* J.A. 265-66 (¶ 6(c)). Indeed, Landlord would never have access to the payment if its remediation obligation exceeded the amount placed in escrow, *see id.*, as was expected here, *see id.* at 446-47 (cost to fully remediate the site would be approximately $4,000,000). It was hence unlikely that Landlord would ever have use of the $1,475,000, and certainly not at the time the rent payment was made. To say that the absence of such a payment in mid-June 2013 caused Landlord prejudice strains credulity.

46

Indeed, under D.C. law, minor delays are not even breaches, let alone justifications for forfeiture. A date set in a contract is generally "an approximation of what the parties regard as a reasonable time under the circumstances," and "[n]either party will be held strictly to the time limit." *Drazin v. Am. Oil Co.*, 395 A.2d 32, 34 (D.C. 1978) (internal quotation marks omitted). While some of this flexibility falls away when the agreement provides time is of the essence, "[e]ven a contract with a time-is-of-the essence clause . . . must be read reasonably." *Dano Res. Recovery, Inc. v. District of Columbia*, 620 A.2d 1346, 1358 (D.C. 1993).[9]

2. Moreover, the existence of "alternative remedies," is dispositive here. *See Shapiro*, 575 A.2d at 300. A remedy less drastic than forfeiture—payment of the $1,475,000—is available to fully rectify any breach. To the ex-

---

[9] The Ground Lease did contain a time-is-of-the-essence clause, stating, under the heading "Miscellaneous," that "time is of the essence with respect to each and every provision of this Lease." J.A. 118 (§ 27.7). Such a general clause may never be effective. *See Independence Mgmt. Co. v. Anderson & Summers, LLC*, 874 A.2d 862, 870 n.10 (D.C. 2005). And it certainly was not effective here: the parties' course of conduct in this case "was not consistent with the approach that time was truly of the essence," *id.* at 870. To the contrary, it is evident that tendering the payment within sixteen days of the notice rather than ten could make no difference given not only the repeated re-negotiations of the date, but also the parties' agreement after the Lease was executed to place the funds into escrow. Deposit into escrow prevented Landlord from using the funds for an extended period after payment, defeating any inference that the payment was a matter of great urgency and that six days would be make-or-break.

tent Landlord incurred any costs from the delay in the payment of money, that is easily remedied by the payment of interest. In fact, the parties contracted for precisely this alternative remedy, providing that unpaid rent "shall bear interest from and after the due date" at a rate of "three percent (3%) over the announced prime rate of Bank of America." *See* J.A. 58 (¶ u); *id.* at 117 (§ 27.1). After concluding that the rent had to be paid by June 13 (setting aside, for present purposes, the merits of this decision), the district court should have employed this alternative remedy, awarding interest at the agreed-upon rate rather than imposing forfeiture of the Lease. *See Shapiro*, 575 A.2d at 298 (holding that "if, on remand, the tenants are found to have breached the lease, the court must consider alternative remedies because forfeiture would be an excessive remedy in the circumstances of this case").

Because payment with interest was an option, the district court's statement that "there is no alternative to timely tendering the rent owed," J.A. 496, is erroneous. That statement also contravenes District of Columbia law, which treats nonpayment of rent as particularly reversible. Even after a judgment of possession is entered against a tenant, but before the landlord redeems the judgment, a tenant may reinstate the lease by tendering "[t]he rent due, with interest and costs," a route that is "no less available to remedy a breach of the obligation to pay rent on time than it is to remedy a breach of the obligation to pay rent at all." *See Pritch v. Henry*, 543 A.2d 808, 812-13

(D.C. 1988) (internal quotation marks omitted) (citing *Trans-Lux*, 54 A.2d 144). Landlord has not obtained, let alone redeemed, a judgment of possession. The district court's statement that the delayed payment or nonpayment is irremediable fails both in fact and in law.

The award of forfeiture is especially befuddling because the district court in fact ordered the alternative remedy in question, directing Tenant to pay Landlord $1,475,000. *See* J.A. 501. In effect, then, the district court's judgment commands Tenant to cure without allowing it the benefit of this act. Tenant must pay the rent that would, under the Lease, entitle it to develop the property for a period of time going forward, *see id.* at 60-61 (§ 2.1), while losing its valuable property right in the Lease itself. *See Cohen v. Food Town, Inc.*, 207 A.2d 122, 124 (D.C. 1965) ("A lease is not an ordinary bilateral contract. It is primarily a conveyance of an estate for years in real estate . . . ." (footnote omitted)).

The law does not countenance this result—as the D.C. Court of Appeals (then called the Municipal Court of Appeals) explained long ago, "The landlord could not dispossess the tenant for nonpayment of rent, which though due, represented a period extending beyond the time of the filing of the action, and at the same time collect rent from the tenant for such period." *Gunn v. Brown*, 59 A.2d 518, 519 (D.C. 1948). "[T]he landlord . . . is in no position to deny to the tenant the right to pay that for which the landlord has

49

made claim and obtained judgment." *Id.* Hence, having filed a counterclaim for the rent—which even if it had "accrued" on May 30, 2013, allowed "the use and occupancy of the premises" for a period after the payment, *see id.*; J.A. 60-61 (§ 2.1)—Landlord cannot now reject Tenant's attempt to cure, that is to tender the payment and to retain its property rights under the Lease.

\*      \*      \*

Tenant did not breach the Lease because the payment was not due on May 30, because payment was due to a non-existent Escrow Agent and Landlord refused to cooperate in amending this obligation, and because Landlord failed to properly terminate while Tenant reasonably and timely cured any default. Moreover, even if a breach occurred, forfeiture was an excessive and legally impermissible remedy, and the district court erred in ordering Tenant to cure and forfeit at the same time.

## CONCLUSION

The district court's grant of summary judgment to Landlord should be reversed, and this case remanded for further proceedings.[10]

---

[10] Because the district court's conclusion that amending the complaint would be futile was based on its erroneous view that Landlord's termination of the Lease was proper, *see* J.A. 499 n.19, Tenant should be free to amend the complaint on remand.

Respectfully submitted,

/s/ John E. Schmidtlein
JOHN E. SCHMIDTLEIN
KENNETH C. SMURZYNSKI
MASHA G. HANSFORD
WILLIAMS & CONNOLLY LLP
  *725 Twelfth Street, N.W.*
  *Washington, DC 20005*
  *(202) 434-5000*

MAY 27, 2014

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, John E. Schmidtlein, counsel for appellants and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), that the attached Brief of Appellants Howard Town Center Developer, LLC, and CastleRock Partners, LLC, is proportionately spaced, has a typeface of 14 points or more, and contains 12,240 words.

/s/ John E. Schmidtlein
JOHN E. SCHMIDTLEIN

MAY 27, 2014

## CERTIFICATE OF SERVICE

I, John E. Schmidtlein, counsel for appellants, certify that, on May 27, 2014, a copy of the attached Brief of Appellants Howard Town Center Developer, LLC, and CastleRock Partners, LLC, was filed electronically through the appellate CM/ECF system with the Clerk of the Court. I further certify that all parties required to be served have been served.

/s/ John E. Schmidtlein
JOHN E. SCHMIDTLEIN

MAY 27, 2014